UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**

JAN 0 9 2015


CLERK

| | |
|---|---|
| JEFFREY BETONE,<br><br>   Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>   Defendant. | 3:12-CV-03018-RAL<br><br><br>OPINION AND ORDER DENYING<br>MOTION UNDER 28 U.S.C. § 2255 |

Petitioner Jeffrey Betone was convicted of two counts of sexual abuse in violation of 18

U.S.C. § 2242 in this Court. <u>United States v. Betone</u>, CR 09-30011-RAL[1], Doc. 97, Doc. 120.

Betone has filed a Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C.

§ 2255. Doc. 1. Betone also filed a supplemental motion to vacate, set aside or correct sentence,

which provided additional information on his claims, Doc. 4, and a Memorandum of Law, Doc.

9. The Government filed a response, Doc. 19, and Betone filed a reply, Doc. 20. Through a

previous Opinion and Order, Doc. 22, this Court denied the § 2255 motion in part and appointed

counsel for Betone. After allowing certain discovery, this Court scheduled and held an

---

[1]Citations to Betone's underlying criminal case will use CR 09-30011-RAL followed by the
document number in the CM/ECF system. Citations to pleadings in this case of CIV 12-3018-
RAL will use just "Doc." followed by the document number in the CM/ECF system. This Court
takes judicial notice under Rule 201 of the Federal Rules of Evidence of all records in Betone's
underlying criminal case.

evidentiary hearing on some of Betone's claims. So that all of this Court's reasoning and ruling is together, this Court incorporates part of the previous opinion and order in this decision.

## I. FACTS

### A. Underlying Criminal Case and Conviction

#### 1. Pretrial Proceedings

Betone was indicted on February 11, 2009, on three counts of sexual abuse in violation of 18 U.S.C. §§ 1153, 2242(1)–(2) and 2246(2)(A)–(B). CR 09-30011-RAL, Doc. 1. Count I charged Betone with sexual abuse by oral copulation of Tate Jensen on the night of March 9, 2005, while Jensen was passed out and had not provided consent. Id. Counts II and III charged Betone with sexual abuse through oral copulation and anal-penile penetration of Valance Blue Arm on May 5, 2008, while Blue Arm was threatened and placed in fear. Id. Betone was charged in federal court under 18 U.S.C. § 1153, and stipulated at trial that he was an "Indian" and that the places where the alleged offenses took place were in "Indian country." CR 09-30011-RAL, Docs.1, 82.

Edward Albright was the attorney initially assigned to represent Betone when the Federal Public Defender was appointed as counsel on February 17, 2009. Doc. 19-1 at ¶ 1. Jana Miner, the Senior Litigator of the Federal Public Defender's Office for North and South Dakota, filed a Notice of Appearance and became primary counsel for Betone on May 12, 2009, and represented Betone during his jury trial. Doc. 19-1 at ¶ 1. Betone's defense and testimony at trial was that he had engaged in consensual sex acts with both victims on the nights in question. Both Jensen and Blue Arm testified at trial that the sexual acts were not consensual.

2

### 2. Facts From Trial

#### a. Count I - Sexual Abuse of Tate Jensen

During the jury trial, several witnesses testified concerning the charge in Count I of Betone's sexual abuse of Tate Jensen at Sherry Turning Heart's apartment. Those witnesses were Jensen, CR 09-30011-RAL, Doc. 101 at 35–68; Sherry Turning Heart, id. at 135–74; Turning Heart's juvenile son, id. at 69–97; Officer Justin Webb, id. at 185–220; special agent of the Federal Bureau of Investigation (FBI) Oscar Ramirez, id. at 237–332; and Betone himself, id. at 457–549. The testimony was consistent in explaining what led up to the time when Jensen and Betone were together at Turning Heart's apartment. In short, Jensen had driven to Eagle Butte and went to the Golden Rule Saloon in Eagle Butte where he met up with Turning Heart. The two of them drank alcohol together until the bar was closing. Id. at 37–39, 140–42. Turning Heart invited others at the bar to continue drinking at her apartment three blocks from the bar. Id. at 39, 142. Jensen, who lived in Lantry and not in Eagle Butte, asked Turning Heart whether he could stay overnight at her apartment because he was too intoxicated to drive. Id. at 43, 145. Turning Heart agreed. Id.

Betone, though only nineteen as of March 9, 2005, also was drinking at the Golden Rule Saloon that night. Id. at 460–61. Betone and others went from the bar to Turning Heart's apartment for an "after party." Id. at 462. Betone, like Jensen and Turning Heart, was intoxicated. Id. at 462. Jensen flirted with Turning Heart at her apartment and spoke with Betone, id. at 40–42, 464; Betone at trial told the jury that it was not ordinary for a straight man to talk with a gay guy, id. at 464. As of March of 2005, Betone knew that he was homosexual, but was not yet open publicly about his sexual orientation. Id. at 464.

3

Around 3:00 a.m., Jensen asked where to sleep, and Turning Heart directed Jensen to sleep on a couch on the main level of the apartment. Id. at 43–46, 144–45. Turning Heart asked all others including Betone to leave, but Betone did not do so at that time. Turning Heart's two bedrooms were upstairs in the two-level apartment. Id. at 145. Turning Heart then went upstairs to a bedroom to go to sleep with her son, who at the time was nine or ten years of age. Id. Jensen, as he put it, "passed out" on the couch. Id. at 46–47.

Jensen described at trial that he was sleeping and then felt something touching his penis area. Id. at 47. He awoke to find his pants unzipped, his penis out, and the sensation of a mouth touching it. Id. Jensen was not sure initially what was going on, heard something beside him, and jumped up to go to the nearby bathroom, where he splashed water on his face. Id. at 47–48. Jensen then saw Betone crawling on the floor by the couch. Id. at 48. Jensen testified at trial that he was not homosexual and did not give consent for Betone to perform fellatio on him. Id. Jensen then decided "to defend" himself and punched Betone in the face. Id. at 49. Betone told Jensen "it wasn't me." Id. By this time, Turning Heart had awakened and had come downstairs. Turning Heart split Betone and Jensen apart and kicked Betone out. Id. at 50–51. Jensen did not call the police, was clearly embarrassed as he testified at trial, and came across at trial as a credible witness.

Turning Heart's trial testimony differed somewhat from the testimony of her nine- or ten-year-old son. Turning Heart's son testified that, after his mother came to bed and went to sleep, he went downstairs to get a drink of water; he saw Jensen laying on the couch with his pants down and with Betone beside him on the floor. Id. at 76, 79–81. According to the boy, Jensen got up, pulled his pants up, went to the bathroom, and called for Turning Heart, so the boy went

4

to get his mother up. Id. at 81–83. The boy followed Turning Heart downstairs and saw Jensen hit Betone and Betone leave thereafter. Id. at 83, 86.

Turning Heart recalled being awakened by her son and going downstairs. Id. at 146–47. She testified that she observed a person on his knees moving about and flipped on the light. Id. at 147. Turning Heart recalled seeing Jensen motionless on the couch with his pants down. Id. at 147–48. Betone was next to the couch near Jensen. Id. at 148. Jensen awakened and was upset with Betone, pushed Betone, and then was crying. Id. at 149, 174. After Betone left Turning Heart's apartment, Turning Heart called the police and, without identifying herself, gave them a description of Betone and told them that they needed to look for him. Id. at 150–52.

Cheyenne River Sioux Tribe police officer Justin Webb was dispatched at 3:38 a.m. on March 9, 2005, to Turning Heart's apartment complex based on a call from an unidentified female. Id. at 187–88. Officer Webb located Betone moving at a staggered run without shoes and with blood on his face from an apparent broken nose. Id. at 189–92. Betone responded to Officer Webb rationally, but with slurred speech, saying that he had fallen. Id. Officer Webb believed Betone's injuries were more consistent with a fight and questioned Betone further. Betone became irritated with the questioning. Id. Under tribal law, Officer Webb took Betone into protective custody[2] and transported Betone to the Bureau of Indian Affairs Indian Health Service (IHS) emergency room in Eagle Butte. Id. at 192. Officer Webb then responded to another call, leaving Betone at the IHS emergency room. Id. at 193. Once Officer Webb left, Betone likewise left the IHS emergency room. Id. at 193–94. Officer Webb contacted Betone the next day, and Betone said that he was too embarrassed to tell how his injury occurred. Id. at

---

[2]The laws of the Cheyenne River Sioux Tribe allow tribal police to make an arrest for protective custody when a tribal member is publicly intoxicated.

194–95.  Officer Webb later talked with Turning Heart who supplied Jensen's name to Officer Webb.  Id. at 196–98.  No charges were pursued against Betone at that time.  Id. at 207, 212. Officer Webb relayed his information to the FBI three years later when the FBI was investigating Betone for conduct involving Valance Blue Arm.  Id. at 215–16.

After the FBI received a report that Betone had sexually assaulted Blue Arm and learned about the earlier incident involving Jensen, FBI special agent Oscar Ramirez interviewed Betone. Id. at 236–37, 242–69.  A portion of that interview was recorded and played to the jury.  Id. at 272, 274.  As concerns his encounter with Jensen, Betone initially denied having any physical or sexual contact with Jensen.  Id. at 256–57.  FBI Agent Ramirez challenged Betone and as the questioning continued Betone changed his story to say that he had sexual contact with Jensen. Id. at 260–64.  The recorded portion of the interview included Betone acknowledging having told FBI Agent Ramirez that Betone thought his sexual contact with Jensen was consensual, "but I guess it wasn't."  CR 09-30011-RAL, Trial Exhibit 8 at 4.  Betone continued that he was not sure if Jensen was passed out, that he had oral sexual contact using his mouth on Jensen's penis, that the contact lasted for less than one minute, and that Jensen was not making any movement before the sexual contact began.  Id. at 5–6.  Betone said that he realized what he had done was wrong and embarrassing on his part and for Jensen.  Id. at 8.  Betone confirmed his understanding that he had admitted to a crime.  Id.

Betone's testimony at trial was different than what he had said on tape to FBI Agent Ramirez.  At trial, Betone said that Jensen undid his own belt and pushed his own pants down after Betone had been rubbing Jensen's crotch through the clothing.  CR 09-30011-RAL, Doc. 101 at 469–70.  Betone said that Jensen was alert and did not object to Betone performing

6

fellatio on him, until a stair light came on and footsteps were heard. Id. Betone said Jensen then pushed him away, buckled up his pants, and later punched Betone in the face. Id. at 470–72. Betone acknowledged lying to Officer Webb about how he sustained the injury to his nose and fleeing from the IHS emergency room after Officer Webb had left him there. Id. at 473–74. The jury believed Jensen (bolstered by Betone's recorded admissions to Agent Ramirez), chose not to believe Betone's trial testimony, and thereby convicted Betone of sexual abuse of Jensen.

There was no mention by name either before or during the trial of a prospective witness named DeAnne Lebeau-West. This Court and counsel became aware only after Betone filed his § 2255 motion that Lebeau-West apparently was in the apartment as well when Betone fellated Jensen.

### b. Counts II and III - Sexual Abuse of Valance Blue Arm

Valance Blue Arm is a lower functioning adult. At the time of his encounter with Betone on May 5, 2008, Blue Arm was twenty-nine years old. He kept his things and sometimes stayed overnight in a trailer house in Eagle Butte where there was no water, electricity, or heating, but also lived in part with his sister. CR 09-30011-RAL, Doc. 101 at 345. Blue Arm functioned somewhat like a child, enjoying watching cartoons and the Disney channel, and tended to dress in an unusual manner. Id. at 350, 356. Blue Arm and Betone did not know one another before their encounter in May of 2008. Id. at 482.

On the evening of May 4, 2008, Betone had been drinking alcohol at the Golden Rule Saloon. He left the bar around 12:45 a.m. or 1:00 a.m. on the early morning of May 5, 2008. Id. at 480. He was driving his father's two-door Dodge truck and went to buy cigarettes. Id. at 481. Betone then drove side streets in Eagle Butte to avoid the police. Id. at 482. When pressed on

7

cross-examination, Betone admitted that he also took the side streets to look for somebody to have sex with.[3]  Id. at 527.  Betone found Blue Arm, who was taking out the garbage, and engaged Blue Arm in a conversation.  Id. at 369, 482–83.  Blue Arm was interested in whether Betone had beer or cigarettes.  Id. at 409, 483.  Betone gave Blue Arm a cigarette and told Blue Arm that there was beer at Betone's home.  Id. at 483–84.  Betone offered Blue Arm a ride, Blue Arm got in the vehicle, and Betone drove two minutes to his home in Eagle Butte.  Id. at 373, 484–86.

Blue Arm's testimony described a strange sexual encounter with Betone.  Blue Arm testified that once inside the home, Betone reached into Blue Arm's pants, pulled off Blue Arm's pants, and would not let Blue Arm go.  Id. at 385–87.  Betone grabbed Blue Arm's penis and tried to put his mouth on it.  Id. at 387.  Betone and Blue Arm ended up in the basement bedroom of Betone's home.  Id. at 392–93.  Betone tried to kiss Blue Arm in the basement, was naked with only a t-shirt on, pushed Blue Arm to the bed, and tried to hump Blue Arm with his penis.  Id. at 394–95, 403.  Blue Arm felt as if Betone was trying to put a finger in his anus and tried to get away.  Id. at 401–03.  Blue Arm furnished a condom to Betone saying something like "if you don't stop, at least use a condom."  Id. at 404, 414–15.  Betone put condoms on several times, but they kept breaking.  Id. at 405, 414–16.  Blue Arm ultimately left Betone's home and walked to the Eagle Butte IHS because he was worried about having contracted HIV/AIDS.  Id. at 417–18.

---

[3]Betone's admission made him sound worse than he likely is.  Betone is intelligent and well-spoken and was working and attending college classes at the time of his indictment.  The jury was able to observe both Blue Arm and Betone testify.  Blue Arm struggled to express himself and to put words together when testifying.  Betone did not have such difficulties when testifying and was articulate, although his admission to driving around looking for somebody with whom to have sex was striking.

When interviewed by FBI Agent Ramirez, Betone initially denied ever having contact with Blue Arm and denied even knowing who Blue Arm was. Id. at 248–50. Later in the interview and during the recorded section of the interview, Betone acknowledged picking Blue Arm up in his father's truck around 1:00 a.m., and inviting Blue Arm to Betone's home to drink beer. CR 09-30011-RAL, Trial Exhibit 8 at 8. Betone told FBI Agent Ramirez that Blue Arm drank beer, that Betone asked Blue Arm if he wanted to engage in sex and that Blue Arm consented. Id. at 9. Betone said that, in his bedroom, his penis entered Blue Arm's anus with a condom on, but the condom broke. Id. Blue Arm then expressed that he was not comfortable with continuing, so Betone let Blue Arm leave. Id. at 9, 13. Betone said that Blue Arm had control of the situation and consented. Id. at 11. Betone acknowledged that Blue Arm had been a stranger to Betone, but that Betone did not notice any mental or intellectual defect in Blue Arm, although Blue Arm, Betone thought, maybe was drunk or a bit slow. Id. at 10–11.

Betone at trial testified in a manner similar to what he told FBI Agent Ramirez. Betone testified that Blue Arm was a complete stranger to him before May 5, 2008. CR 09-30011-RAL, Doc. 101 at 482–83. Betone testified that when upstairs at Betone's home, he asked Blue Arm if he wanted to have oral sex, that Blue Arm consented, and that he then performed fellatio on Blue Arm. Id. at 486–88. Betone testified that Blue Arm unbuckled and unzipped his own pants. Id. at 487–88. According to Betone's testimony, he asked if Blue Arm wanted to go somewhere where he would be more comfortable. Id. at 488. Betone testified that they went downstairs, where they both fondled each other and where Betone asked Blue Arm if he "could go all the way," to which Blue Arm consented. Id. at 490–02. Betone at trial said that Blue Arm put the condom on Betone and that Blue Arm took off his own clothes. Id. at 494–95. Betone agreed that his penis had entered Blue Arm's anus, but said it was consensual. Id. at 496–97. Betone

denied threatening Blue Arm and confirmed that condoms were breaking and being replaced. Id. at 495–97. Betone testified that he let Blue Arm leave when Blue Arm said that he did not want to do this anymore. Id.

A physician assistant (PA) and a nurse treated Blue Arm upon his arrival at the Eagle Butte IHS around 3:22 a.m. Id. at 103, 109. Blue Arm behaved scared, anxious, and fidgety. Id. at 106, 119–20, 128. Blue Arm was crying at times and reported to the PA that a man "sucked my dick" and "put his dick in [my] butt." Id. at 121. The PA and nurse did a sexual assault kit and examination.[4] Id. at 125. Blue Arm was wearing multiple layers of clothing, including several layers of underwear. Id. at 106, 124–25. The nurse called the Cheyenne River Sioux tribal police and an officer responded to the IHS. Id. at 110, 334. The officer observed Blue Arm shaking, had a short conversation with Blue Arm and noticed that Blue Arm's speech pattern was broken up. Id. at 337–38. The FBI's investigation and Agent Ramirez's interview of Betone followed.

At trial, the jury convicted Betone of two counts of sexual abuse: Count 1, sexual abuse of Jensen when Jensen was incapable of appraising the nature of the conduct and was physically incapable of declining participation in and communicating unwillingness to engage in a sexual act; and, Count 2, sexual abuse in the form of oral copulation of Blue Arm by threat and placing Blue Arm in fear. CR 09-30011-RAL, Doc. 97. The jury found Betone not guilty on Count III, which had charged Betone with sexual abuse through anal penetration of Blue Arm. Id. Betone's dissatisfaction with his attorney Jana Miner became known to this Court before sentencing. On August 16, 2010, this Court granted Miner's motion to withdraw as counsel.

---

[4]There were no physical findings of bruises or swelling and no semen found on the anal swab. The absence of physical evidence from the sexual assault kit connecting Betone to anally penetrating Blue Arm matters little because Betone acknowledged doing so and condoms were used. CR 09-30011-RAL, Doc. 101 at 125–127, 224.

Doc. 19-1 at ¶ 1; CR 09-30011-RAL, Doc. 114.   Jamie Damon, a Criminal Justice Act panel attorney outside of the Federal Public Defender's Office, then was appointed and represented Betone at sentencing and on appeal. CR 09-30011-RAL, Doc. 116.

Betone was sentenced within the advisory guideline range to 151 months of custody and five years of supervised release on each count to run concurrently. CR 09-30011-RAL, Doc. 120.  Betone appealed his conviction to the United States Court of Appeals for the Eighth Circuit, and the Eighth Circuit affirmed his conviction and sentence.  United States v. Betone, 636 F.3d 384 (8th Cir. 2011).  Betone currently is incarcerated at the Federal Correctional Institute in Seagoville, Texas, and seeks relief from his conviction and sentence under 28 U.S.C. § 2255.  Doc. 1.

### B. Testimony at Evidentiary Hearing

This Court on September 23, 2014, held an evidentiary hearing on claims in Betone's § 2255 motion that could not be decided as a matter of law.  Among those claims were that the prosecutor, Assistant United States Attorney Mikal Hanson, had withheld information both on a favorable witness, DeAnne Lebeau-West, and on witness Camilla Collins's criminal history. Hanson testified at the evidentiary hearing that his file contained no information about any criminal record of Camilla Collins, who was one of the Government witnesses called to establish that Blue Arm had an intellectual defect.  Hanson had no knowledge of whether Collins had any criminal record.  Hanson knew who DeAnne Lebeau-West was because he had twice prosecuted her husband on federal charges.  Lebeau-West never approached Hanson to identify herself as a witness, and her name was not associated with any information in the file at the time of the jury trial.  Hanson did not know that Lebeau-West was a relative of Sherry Turning Heart.  Hanson

11

testified that he would have revealed to Betone's trial counsel any information on any such witness or on any claim of fabricated testimony.

Lebeau-West, who is Turning Heart's sister, testified during the evidentiary hearing that she knew attorney Hanson as the prosecutor of her husband in an unrelated case. Lebeau-West never approached Hanson concerning Betone's case, but only briefly spoke with Hanson about the case against her own husband and not about anything else. Lebeau-West knew that Turning Heart was going to testify at Betone's trial because Turning Heart had told Lebeau-West about not being excited about having to testify. Lebeau-West testified that she could not say that Turning Heart fabricated her testimony.

Lebeau-West was staying at the Turning Heart apartment in March of 2005. Lebeau-West recalled that, on the night of the Betone–Jensen incident, Turning Heart was very intoxicated, the apartment smelled like alcohol, and Lebeau-West was sober and not drinking with the rest of the group. Lebeau-West slept in a bedroom upstairs in the apartment, but came downstairs to use the bathroom in the wee hours of the morning on more than one occasion. Each time she saw Betone and Jensen closer together, with Jensen on the floor close to Betone on the last occasion. Lebeau-West did not see any sexual contact between Betone and Jensen, but saw them drawing closer to one another throughout the night. After being awakened, Lebeau-West saw Jensen on the steps crying and Betone in the bathroom. Lebeau-West then saw Jensen and Turning Heart confronting Betone and forcing Betone to leave the apartment. Lebeau-West recounted this information to her mother, Ina Lebeau (who is unconnected with either the Government or the defense) and to Betone's brother Erik. Lebeau-West did not speak to law enforcement about what she saw.

12

During the evidentiary hearing, Jana Miner, the trial counsel for Betone, testified about her lengthy experience. Miner graduated with her juris doctorate in 1983 and has been a trial lawyer doing criminal defense work ever since. She worked for the Pennington County Public Defender's Office for two years, was in private practice for six years, joined a Federal Public Defender's Office in New Mexico, worked for Federal Public Defender's offices in Kansas City and Sioux City, and opened the Pierre Federal Public Defender's Office in January of 2000. Miner presently is the senior litigator for the Federal Public Defender for North and South Dakota.

Miner had sent the standard discovery requests to the United States Attorney's Office in Betone's case, had a private investigator employed with the Federal Public Defender's Office work on the case, and spoke with Betone about the case and facts underlying the charges. The investigator interviewed people listed in police reports and those who were identified as being present in the Turning Heart apartment. Nothing in her file suggested that Lebeau-West was present or a witness to the Betone–Jensen incident, and no one advised Miner that Lebeau-West might have been in the apartment. No one told Miner that Turning Heart allegedly was fabricating her testimony. Miner was unaware of any criminal history of Camilla Collins. Based on the information she had, Miner presented the defense that all of the sex acts at issue were consensual in nature. Miner's theory was that Jensen consented to the fellatio and that, when interrupted, Jensen reacted angrily toward Betone out of embarrassment. Miner argued that Blue Arm likewise consented, but then had second thoughts and left.

The final witness at the evidentiary hearing was Erik Betone, the brother of Betone. Erik knew Lebeau-West through a mutual friend and heard her say that she was at the apartment babysitting Turning Heart's son, that she observed Jensen and Betone "going at it on the couch,"

13

and that Jensen was not fighting back but going along with it. When Erik heard Lebeau-West make these statements, both Erik and Lebeau-West were "buzzed up" and drinking alcohol. These statements conflict with Lebeau-West testifying under oath during the evidentiary hearing that she did not see a sex act between Betone and Jensen.

## II. DISCUSSION

Betone sought relief in his § 2255 motion on three grounds: (1) ineffective assistance of counsel; (2) failure of the prosecutor to disclose exculpatory evidence; and (3) newly discovered evidence. Doc. 1 at 4–7.

### A. Timeliness of the § 2255 Motion

Under 28 U.S.C. § 2255, a prisoner in federal custody is subject to a one-year statute of limitations in applying for relief. 28 U.S.C. § 2255(f). Betone did not seek review from the Supreme Court of the United States following his direct appeal to the Eighth Circuit. Doc. 1 at 2. Therefore, his conviction became final ninety days after the Eighth Circuit entered its judgment. United States v. Hernandez, 436 F.3d 851, 856 (8th Cir. 2006). The mandate issued by the Eighth Circuit affirming Betone's conviction was filed on June 15, 2011. CR 09-30011-RAL, Doc. 136. Betone filed his § 2255 motion on June 8, 2012, within the one-year statute of limitations. Doc. 1. Betone's § 2255 motion was timely filed in accordance with 28 U.S.C. § 2255(f).

### B. Ineffective Assistance of Counsel Claims

Betone's first argument for relief asserted ineffective assistance of counsel. The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel in criminal prosecutions. U.S. Const. amend. VI; see also Gideon v. Wainwright, 372 U.S. 335 (1963); Johnson v. Zerbst, 304 U.S. 458 (1938); Powell v. Alabama, 287 U.S. 45

14

(1932). A defendant who claims to have been deprived of effective assistance of counsel must show: (1) that his lawyer's representation fell below an objective standard of reasonableness; and (2) that the lawyer's deficient performance prejudiced the defendant. Strickland v. Washington, 466 U.S. 668, 688, 692 (1984); Nupdal v. United States, 666 F.3d 1074, 1075 (8th Cir. 2012) (citing Barger v. United States, 204 F.3d 1180, 1182 (8th Cir. 2000)). For the first requirement of the Strickland test, "the court must apply an objective standard and 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance,' Strickland, 466 U.S. at 690, while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions." Nave v. Delo, 62 F.3d 1024, 1035 (8th Cir. 1995). To establish prejudice to satisfy the second prong of the Strickland test, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Because hindsight analysis is problematic, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." United States v. Staples, 410 F.3d 484, 488 (8th Cir. 2005) (quoting Strickland, 466 U.S. at 689); Hunter v. Bowersox, 172 F.3d 1016, 1024 (8th Cir. 1999). Decisions involving trial strategy are therefore "virtually unchallengeable." Link v. Luebbers, 469 F.3d 1197, 1204 (8th Cir. 2006). "The Sixth Amendment right to counsel functions to ensure that defendants receive a fair trial, not a perfect one." Willis v. United States, 87 F.3d 1004, 1008 (8th Cir. 1996).

Betone made various assertions about why he believes his trial counsel was ineffective. Betone's first argument for ineffective assistance of counsel was that trial counsel failed to investigate the background of Blue Arm's sister, Camilla Collins. Betone argued that trial

15

counsel could have obtained evidence that would have undermined the credibility of Collins by raising issues about her history of incarceration and psychiatric treatments. Doc. 4 at 14. The Government called Collins as a witness during its case-in-chief to testify about Blue Arms' life and level of functioning. CR 09-30011-RAL, Doc. 101 at 342. Miner did not cross-examine Collins about any history of psychiatric treatments, but the Federal Rules of Evidence do not provide any mechanism by which a witness can be impeached merely by having a history of psychiatric treatments.    Miner also did not cross-examine Collins about any history of incarceration, but such information about Collins may not have been admissible as impeachment testimony under Federal Rule of Evidence 609.  Nevertheless, this Court allowed Betone an opportunity to present testimony and evidence about whether Collins had a criminal record at the evidentiary hearing, Doc. 22 at 5–6, and Betone failed to do so.  At the evidentiary hearing, Miner testified that she sent standard discovery requests to the Government, received no information on Collins having a criminal history, was told by no one that Collins had a criminal history, and was unaware of any such criminal history.  Betone has not satisfied either prong of the Strickland test with regard to his trial counsel's preparation for and handling of Collins' testimony. 466 U.S. at 688–89. Betone's trial counsel objected during Collins's direct testimony, engaged in proper cross-examination of Collins, and was able to attack her testimony in other ways.  Trial counsel's failure to impeach Collins in a way likely violative of the Federal Rules of Evidence did not prejudice Betone.

Betone next argued that trial counsel was ineffective for failing to interview and subpoena Katie Dupris for trial, who was an alleged eyewitness to Betone's interaction with Jensen and Turning Heart. Doc. 4 at 14. According to Betone, Dupris at some point saw individuals standing in a field, but was absolutely unaware of what occurred. Doc. 4 at 14.

16

Betone contended that testimony from Dupris could have provided a different timeline than did Jensen about Jensen's striking of Betone. Doc. 4 at 14. Betone contends that if she had been called at trial, Dupris would have testified to witnessing Jensen and Turning Heart assaulting Betone on the night Betone sexually assaulted Jensen. Doc. 20 at 2; see CR 09-30011-RAL, Doc. 101.

Neither prong of the Strickland test is satisfied for this claim. There was no prejudice to Betone that Dupris was not called to testify because she was not aware of what had happened inside the home where Betone's sexual encounter with Jensen occurred. The undigested evidence established that Jensen punched Betone in the face after Betone fellated Jensen. Any testimony from Dupris on that subject would have been cumulative. The issue at trial was whether Betone's acts were consensual sexual contact with Jensen. CR 09-30011-RAL, Doc. 101 at 466–70. Betone has not explained how a witness from outside the home who was "totally unaware of what was happening" that evening could provide exculpatory evidence relevant to whether the sexual act was consensual. Trial counsel's election to not call Dupris to the witness stand was not defective. Decisions of trial counsel about whether to call a witness are included in the ambit of trial strategy. Staples, 410 F.3d at 488. Because decisions involving trial strategy are "virtually unchallengeable," Link, 469 F.3d at 1204, this Court cannot conclude that trial counsel was objectively unreasonable in not calling Dupris as a witness.

Betone then argued that trial and appellate counsel were ineffective because each waived the defense of lack of jurisdiction. Betone contended that federal criminal jurisdiction in Indian country is "an open question." Doc. 4 at 14. This is not true. The Major Crimes Act, 18 U.S.C.

17

§ 1153, grants exclusive jurisdiction to the United States to prosecute Indians[5] for certain crimes

occurring in Indian country. The Supreme Court of the United States upheld the constitutionality

of the Major Crimes Act in United States v. Kagama, 118 U.S. 375, 385 (1886). The Supreme

Court has continued to make clear that its decision in Kagama was not anomalous and that the

Major Crimes Act is constitutional. See, e.g., Negonsott v. Samuels, 507 U.S. 99, 103 (1993);

Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 203–04 & n.14 (1978); Lone Wolf v.

Hitchcock, 187 U.S. 553, 566–67 (1903); United States v. Thomas, 151 U.S. 577, 585 (1894).

"Congress has undoubted constitutional power to prescribe a criminal code applicable in Indian

country." United States v. Antelope, 430 U.S. 641, 648 (1977). Betone is incorrect in asserting

that there is an open question as to whether this Court has criminal jurisdiction. Because the

question of federal criminal jurisdiction in Indian country over major crimes committed by or

against Indians is settled law, trial and appellate counsel were not ineffective for failing to raise

the issue. See Hamburg v. United States, 675 F.3d 1170, 1173 (8th Cir. 2012) ("If we do not

require counsel to raise arguments that anticipate changes in the law or raise unsettled issues of

law, then it cannot be considered professionally unreasonable for counsel to fail to object to the

---

[5]As this Court noted in Federal Trade Commission v. Payday Financial, LLC, 935 F. Supp. 926, 929 n.1 (D.S.D. 2013):

> The word "Indian" has acquired a legal meaning through the course of this nation's history. The origin of the word "Indian" dates back to the mistaken belief of early European explorers in North America that they had encountered people in the East Indies. While it is more appropriate in this era to refer to this nation's indigenous people as Native Americans or American Indians, this Opinion and Order uses the word "Indian" as that is the word used for two centuries in legal opinions to refer to the indigenous population of North America and has come to have a distinct legal meaning. See St. Cloud v. United States, 702 F.Supp. 1456, 1459–61 (D.S.D. 1988) (delineating meaning of "Indian" under laws of United States); see also United States v. Stymiest, 581 F.3d 759, 763–64 (8th Cir. 2009).

correct application of settled law within our circuit."). There is no merit to Betone's claim that his attorney was ineffective or deficient in waiving a defense of lack of jurisdiction.

Betone next alleged that this Court spoke directly to a potential juror during voir dire and announced, "Don't worry, we got enough evidence on him." Doc. 4 at 14. This Court did not make that statement, has carefully reviewed the voir dire transcript, and has found no statement in any respect similar in nature. CR 09-30011-RAL, Doc. 125. Betone claimed that counsel was ineffective for failing to object to the statement and for failing to raise the issue on appeal. Because no such statement was ever made, counsel could not have been ineffective for failing to object to and appeal the issue. Nevertheless, this Court allowed Betone the opportunity to present additional evidence on this claim at the evidentiary hearing in part out of curiosity of how Betone came to such a wildly mistaken belief. The attorney appointed by this Court for Betone in his § 2255 case received the voir dire transcript and was granted an opportunity to listen to the FTR recording of voir dire to make sure that the transcript was the same as the in-court audio recording. No such statement and nothing anywhere close to such a statement was made. How Betone got the notion that any such statement was made remains mystifying.

Betone next argued that he received ineffective assistance of counsel because trial counsel did not object to, and appellate counsel did not raise on appeal, this Court's refusal to excuse for cause a juror who identified prejudice against Betone's sexual orientation and asked to be excused. Doc. 4. at 14. One juror stated that her religious belief was that homosexuality was a sin rather than a sexual preference. CR 09-30011-RAL, Doc. 125 at 71–72. However, the juror confirmed that she would keep her religious beliefs separate, would follow instructions on

the law,[6] would decide the case based on the evidence, and would not think Betone was a bad person for engaging in homosexual acts. Id. at 72. The juror was not dismissed for cause, but was not selected to serve on the jury. Id. at 74. Trial counsel and appellate counsel were not ineffective in failing to object to this juror not being excluded for cause. See United States v. Nelson, 347 F.3d 701, 711 (8th Cir. 2003) (finding no error in a trial court's factual finding that a juror could be impartial after she swore she could put aside outside information and make a decision based on the evidence presented during trial); United States v. Allee, 299 F.3d 996, 1001 (8th Cir. 2002) (concluding that jury was impartial and fair where jurors asserted that they would decide the case only on the evidence presented). The prospective juror at issue here made clear that despite her personal religious beliefs, she would hear the evidence and decide the case based on the evidence and instructions of law. In addition, there is no prejudice under the second prong of Strickland because the juror ultimately was not selected, and Betone has no argument that somehow the makeup of the twelve-person jury would have been different if the juror at issue had been excused for cause. 466 U.S. at 694.

Betone next had a laundry list of actions that trial counsel failed to do:

(1) subpoena Medical records of evidence of physical/aggravated assault committed on petitioner from Eagle Butte Indian Health Service and Rapid City Medical Center; (2) obtain weather temperature information; (3) cross-examine the complainants concerning the theft of petitioner's car keys, wallet, vehicle, shoes, and jacket; (4) obtain information concerning the physical assault from Cheyenne River Sioux Tribe Police Department Records and from Officer Justin Webb; (5) and (a) subpoena petitioner's bank records and (b) witnesses to sexual assault committed on movant by Tate Jensen when he was in a comatose alcohol induced state in Sherri [sic] Turning Heart's Apartment on March 9, 2005.

---

[6]This Court's instructions included admonitions against bias and prejudice and listed elements of the offense. E.g., Doc. 95 at 2.

Doc. 4 at 14. These alleged deficiencies made no difference to Betone's conviction. Indeed, added evidence of Jensen being "in a comatose alcoholic induced state" would have further undermined Betone's defense that Jensen consented to the sex act. Records of Betone's physical injury or not having his keys and other personal items do not matter when it was undisputed that Jensen punched Betone in the face causing injury to Betone on the night Betone fellated Jensen and that Betone left the Turning Heart apartment barefoot, injured, and without keys. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. Betone has not met this benchmark concerning these additional matters, some of which merely would have reinforced information already in evidence, would have been cumulative, or would have been inadmissible at trial. There also was no prejudice under the second prong of Strickland for trial counsel's decision not to pursue any of these avenues. 466 U.S. at 688.

Finally, Betone alleged that the previously-listed failures of trial counsel "may have resulted from a conflict of interest as a result of counsel's personal relationship with Tate Jensen and Jensen's family." Doc. 4 at 14. Betone's primary argument that trial counsel had a conflict of interest is his assertion that trial counsel did not impeach Jensen during his testimony and did not pursue alibi witnesses. Doc. 9 at 5, 7. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the

21

constitutional predicate for his claim of ineffective assistance." Id. at 349–50 (internal citations omitted); see also Covey v. United States, 377 F.3d 903, 906–07 (8th Cir. 2004) (noting the Supreme Court has never extended Cuyler beyond conflicts involving multiple or serial representation). "An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." Mickens v. Taylor, 535 U.S. 162, 172 n.5 (2002). "'Adverse effect' is not the equivalent of prejudice." Covey, 377 F.3d at 908. To demonstrate adverse effect, a defendant must identify "some actual and demonstrable adverse effect on the case, not merely an abstract or theoretical one." United States v. Flynn, 87 F.3d 996, 1001 (8th Cir. 1996). The "effect on representation" means that the conflict caused the attorney's decision, not that the decision was prejudicial to the defendant in any other way. Covey, 377 F.3d at 908.

Betone did not establish that trial counsel Miner had an actual conflict of interest. Betone did not raise an objection to counsel at trial, and therefore must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." Sullivan, 446 U.S. at 348. Miner submitted an affidavit to this Court regarding her familiarity with Jensen and his family. Doc. 19-1. Miner does not have, and has never had, a personal relationship with the Jensen family. Miner disclosed to Betone that she knew of the Jensen family because she had previously represented a woman who pleaded guilty to killing Tate Jensen's brother. Miner also had represented a cousin of Jensen; that cousin believed that Miner did not provide adequate representation. Doc. 19-1 at ¶ 3. Although Miner represented a cousin of Jensen and an individual whose victim was Jensen's brother, her past representation of those individuals does not create a conflict of interest. Betone has been unable to show an "actual conflict of interest." Betone also cannot show an "actual and demonstrable adverse effect on the case." Flynn, 87 F.3d at 1001. Miner vigorously and properly cross-examined Jensen in an attempt to support

22

Betone's theory of the case that Jensen had consented to the sexual act and then became embarrassed and overreacted when the sex act was interrupted. See CR 09-30011-RAL, Doc. 101 at 54–68.

Betone also argued that Miner's alleged conflict of interest led to her failure to investigate and interview an alibi witness. Doc. 9 at 7. Betone told Miner before trial that he had sexual contact with Jensen and Blue Arm but that the sex acts were consensual. Doc. 19-1 at ¶ 5. Because Betone had told FBI Agent Ramirez that he engaged in sex with Jensen and Blue Arm and then so testified at trial, the lack of an alibi witness at trial could not have been prejudicial. Betone has not identified an alibi witness anyway to Miner or to this Court. Betone has not shown ineffective assistance of counsel and has not shown any prejudice related to any claimed conflict of interest causing Miner not to pursue alibi testimony.

None of Betone's ineffective assistance of counsel claims have any validity. Betone received effective and competent counsel and was not prejudiced by counsel, either at trial or on appeal. See Winters v. United States, 716 F.3d 1098, 1103–06 (8th Cir.) (examining thirty-six claims of ineffective assistance of pretrial, trial and appellate counsel and finding that none warranted an evidentiary hearing), cert. denied, 134 S. Ct. 447 (2013).

### C. Alleged Failure of Prosecutor to Disclose Exculpatory Evidence

Betone set forth his next ground for relief as:

> Movant has learned, subsequent to trial, that the Federal Prosecutor Hanson was given information by DeeAnn Lebeau-West two weeks before the trial that her sister ([Sherry] Turning Heart) fabricated the whole story. Yet, Hanson called her just another drunken Indian[7] that no one will believe anyway, and failed to disclose that information to defense counsel.

---

[7]Hanson testified that he never made such a statement, and Lebeau-West testified that she never heard Hanson make any such statement. There is utterly no evidence to support this part of Betone's assertion.

Doc. 4 at 16. "As a general rule, '[p]rosecutorial misconduct does not warrant federal habeas relief unless the misconduct infected the trial with enough unfairness to render [petitioner's] conviction a denial of due process.'" Louisell v. Dir. of Iowa Dep't of Corr., 178 F.3d 1019, 1023 (8th Cir. 1999) (alteration in original) (quoting Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998)). To violate due process, a prosecutor's conduct must be so egregious as to render a defendant's trial fundamentally unfair. Stringer v. Hedgepeth, 280 F.3d 826, 829 (8th Cir. 2002). This standard requires that a habeas "petitioner 'must show that there is a reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety the verdict probably would have been different.'" Id. (quoting Anderson v. Goeke, 44 F.3d 675, 679 (8th Cir. 1995)).

A different standard applies when a petitioner seeks a new trial when a prosecutor obtained a conviction with the knowing use of perjured testimony. United States v. Duke, 50 F.3d 571, 577 (8th Cir. 1995); see also Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993) (characterizing the "knowing use of perjury" standard as "considerably less onerous" for a movant than the standard of materiality applied for an alleged Brady violation). The Supreme Court has held that a conviction obtained through the knowing use of perjured testimony "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). The test used is a "materiality standard," meaning "the fact that the testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt." United States v. Bagley, 473 U.S. 667, 680 (1985) (opinion of Blackmun, J.).[8]  Betone alleged in his § 2255

---

[8]This proposition comes from a portion of the opinion that is not the opinion of the court. Justice Blackmun announced the opinion and parts I and II of his opinion were joined by four other justices. However, this comes from part III which was joined in by only one other justice.

motion that Turning Heart, who testified for the Government about some events surrounding Betone's sexual assault on Jensen, falsified her testimony, and that prosecutor Hanson became aware of the false testimony two weeks before trial from Lebeau-West, Turning Heart's sister. See CR 09-30011-RAL, Doc. 101 at 136; Doc. 4 at 16. If Hanson knew that Turning Heart was perjuring herself on the stand, it would have been improper for Hanson to introduce such testimony and Hanson would have been required to provide such information to the defense under Brady v. Maryland, 373 U.S. 83 (1963). Further, if Hanson did knowingly convict Betone using the perjured testimony of Turning Heart, the conviction on Count I must be set aside if there is any reasonable likelihood that the perjured testimony by Turning Heart affected the jury's judgment. Agurs, 427 U.S. at 103. Because Turning Heart was corroborating evidence that Betone's sexual contact with Jensen occurred while Jensen was passed out, her testimony was important to the Government's case and could have affected the jury's decision. See Id. at 103–04. Because this Court could not determine without further evidence whether Turning Heart's testimony was perjured and whether Hanson knew so two weeks before the trial date, this Court held an evidentiary hearing on the matter.

The testimony at the evidentiary hearing established that Hanson had no knowledge that Turning Heart's testimony was allegedly perjured. Indeed, the testimony at the evidentiary hearing failed to establish that Turning Heart committed perjury. Lebeau-West's testimony would have been helpful to Betone, but Lebeau-West did not come forward to authorities despite knowing that Betone was being tried. Lebeau-West spoke only with her mother and then Betone's brother about the night of the Betone-Jensen incident, prior to the time Betone filed his

While the three concurring justices do not join in this part of the opinion, this does not appear to be the portion of part III which they take issue.

§ 2255 motion.[9] It is not Hanson's fault that Lebeau-West was not a trial witness and the claim for relief based on alleged prosecutorial misconduct must be denied.

### D. Newly Discovered Evidence

Betone's third ground for relief asserted the discovery of new evidence. Discovery of new evidence alone is generally not a sufficient ground for relief under § 2255. United States v. Addonizio, 442 U.S. 178, 185 (1979) (finding § 2255 is only available to attack convictions entered by courts without jurisdiction, resulting from proceedings with constitutional error, or resulting from proceedings with an error of law sufficient to create a fundamental trial defect inherently causing a complete miscarriage of justice). The proper avenue for relief for newly discovered evidence is a Rule 33(a) motion for a new trial. However, the § 2255 motion was made within the three-year time period for filing motions for new trial based on new evidence, and there is some precedent for treating § 2255 motions based solely on newly discovered evidence as motions for a new trial. See Lindhorst v. United States, 658 F.2d 598, 602 (8th Cir. 1981) ("When newly discovered evidence is the ground for a § 2255 motion, the district court should apply the same substantive test which governs a motion for a new trial under Fed. R. Crim. P. 33 premised upon the same ground."(citations omitted)); Everitt v. United States, 353 F.2d 532 (5th Cir. 1965). "Motions for new trial based on newly discovered evidence are disfavored." United States v. Jones, 34 F.3d 596, 600 (8th Cir. 1994). In general, a new trial will be granted only if (1) the evidence was discovered after trial; (2) the failure to discover this evidence was not attributable to a lack of due diligence on petitioner's part; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is likely to produce

---

[9]While not the result of prosecutorial misconduct, the evidentiary hearing revealed that Lebeau-West was a previously-unknown potential witness to events surrounding the Betone–Jensen incident because she and her then-boyfriend were at Turning Heart's apartment (although not part of the party). The issue of whether that fact is newly discovered evidence that could provide grounds for relief is addressed in the next section of this Opinion.

an acquittal if a new trial is granted. United States v. Huggans, 650 F.3d 1210, 1225 (8th Cir. 2011); United States v. Dogskin, 265 F.3d 682, 685 (8th Cir. 2001).

Betone identified two pieces of allegedly newly discovered evidence. The first is that Cheyenne River Sioux Tribe Detective Larry LeBeau allegedly helped Sherry Turning Heart perjure her testimony and that Turning Heart's boyfriend had an arrest record. Doc. 4 at 15. Betone based this claim on unidentified evidence that Turning Heart was not home on the night that Jensen was assaulted in Turning Heart's home. Doc. 4 at 15. Betone claimed that there is "new evidence" to show that Turning Heart was not present, but only identified that no Cheyenne River Sioux Tribe Law Enforcement records show an arrest of Turning Heart or her boyfriend on that evening. Doc. 4 at 15. The lack of an arrest record is not material evidence. See Huggans, 650 F.3d at 1225. Turning Heart called the tribal police anonymously and Officer Webb did not speak with her about the incident until after that night. This is not new evidence and provides no reason for relief under § 2255. Any evidence of Turning Heart's boyfriend's arrest record is not relevant and would not produce an acquittal if a new trial is granted. See id. No one identified Turning Heart's unnamed boyfriend as having anything to do with Betone's fellatio on Jensen or on Blue Arm. And, as earlier stated, Betone presented no evidence that Turning Heart perjured herself.

Betone's second argument about "new evidence" was that Jensen's statement that he was assaulted at 5:00 a.m. is undermined by evidence that Betone was at the Eagle Butte IHS at 3:50 a.m. Doc. 4 at 15. Jensen was less than clear at trial about the time at which he awoke to Betone fellating him, testifying on cross-examination that it was after he went to sleep but at least a couple of hours before he was to go to work—maybe 5:00 a.m. CR 09-30011-RAL, Doc. 101 at 35–68. Betone of course has not shown that this evidence was unavailable before trial, and

27

Officer Webb testified during the jury trial that he was dispatched to look for Betone around 3:38 a.m. This Court allowed Betone to present evidence at the evidentiary hearing on this subject. Betone chose not to do so. Miner testified briefly at the evidentiary hearing to what is obvious; a discrepancy in what time the sex act occurred of an hour or two is not very significant where Betone concedes engaging in a sex act and where the issue at trial was whether the sex act was consensual. More evidence that the sex act occurred earlier than 5:00 a.m. would not result in an acquittal if a new trial were granted. See Huggans, 650 F.3d at 1225.

As noted above, the fact that Lebeau-West and her then-boyfriend were present in Sherri Turning Heart's apartment the night of Betone assaulted Jensen presents a third piece of newly discovered evidence. This evidence was discovered during the evidentiary hearing for this motion, and although not part of Betone's § 2255 motion, Betone's counsel argued it constituted grounds for a new trial during the evidentiary hearing. Lebeau-West's testimony is not so helpful to Betone that it would probably produce an acquittal. When a movant requests a new trial based on newly discovered evidence, he or she must present "material evidence, not merely cumulative or impeaching, that came to light subsequent to trial and would probably produce an acquittal." United States v. Daniele, 931 F.2d 486, 488 (8th Cir. 1991). Lebeau-West did not witness any interaction between Betone and Jensen and was only able to say that they seemed to be closer to one another each of the times she was in the living room. Lebeau-West did not witness any conduct by Jensen that would suggest consent strongly enough to overcome Betone's own admissions and the other evidence presented against him at trial.

Likewise, the failure to call Lebeau-West as a witness does not constitute ineffective assistance of counsel. Neither the people in the apartment nor Lebeau-West herself revealed to the Government or Miner's investigator that Lebeau-West was present on the night in question.

28

Even so, Lebeau-West's testimony at most suggests that Jensen and Betone were moving closer to one another in the night: Lebeau-West testified at the evidentiary hearing that she did not see any interaction or sexual contact between Betone and Jensen. Betone meanwhile told FBI Agent Ramirez that he had fellated Jensen, that Jensen was not moving at the time and may have been passed out, that Betone "thought it was consensual but I guess it wasn't," and that Betone understood that he had admitted to a crime. CR 09-30011-RAL, Trial Exhibit 8 at 4–6. The jury heard Betone on tape admit to making those statements. Id. Under those circumstances, the lack of Lebeau-West as a trial witness appears not to have been the sort of "prejudice" under the Strickland test that would justify § 2255 relief anyway. Strickland, 466 U.S. at 688, 694; Nupdal, 666 F.3d at 1075.

Lebeau-West's testimony of course has nothing to do with Betone's conviction on Count II of the Indictment for sexual abuse of Blue Arm. Lebeau-West was not a witness to anything that occurred between Betone and Blue Arm.

### E.  Ineffective Assistance of Counsel at Sentencing

Finally, Betone claims that counsel at sentencing was unaware of the facts of the case and failed to bring the extenuating facts discussed here to the attention of this Court. Doc. 4 at 15. This appears to be an ineffective assistance of counsel claim. To show ineffective assistance of counsel at the sentencing phase, a defendant must establish both prongs of the Strickland test by showing that (1) his lawyer's representation fell below an objective standard of reasonableness; and (2) the lawyer's deficient performance prejudiced the defendant. See Champion v. United States, 319 F. App'x. 443, 445 (8th Cir. 2009) (per curiam); Strickland, 466 U.S. at 688. The newly discovered evidence asserted by Betone is not the type of evidence that would have made a difference at sentencing. Counsel's performance at sentencing did not fall below an objective

standard of reasonableness. There was no prejudice to Betone for counsel's failure to argue the matters that Betone now contends to be new evidence. Betone is unable to prove either prong of the <u>Strickland</u> standard and is not entitled to relief based on the ineffective assistance of counsel claim at sentencing.

## III. CONCLUSION

The motion, files, and records of the case conclusively show that Betone is not entitled to relief under 28 U.S.C. § 2255. Therefore, it is hereby

ORDERED that Petitioner's Motion to Vacate, Set Aside, or Correct Sentence, Doc. 1, is denied. It is further

ORDERED that Petitioner's Supplemental Motion to Vacate, Set Aside, or Correct Sentence, Doc. 4, is denied. It is further

ORDERED that judgment of dismissal of this case hereby enters. It is finally

ORDERED that no certificate of appealability enters.

DATED this 9th day of January, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE